# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2020

NATHANIEL LINDELL,

*Plaintiff-Appellant,*

*v.*

STEVEN HOUSER, Officer,
WILLIAM SCHULTZ, and
JEFFREY FRIDAY,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02 C 459—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED FEBRUARY 13, 2006—DECIDED APRIL 4, 2006

_____

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges.*

EVANS, *Circuit Judge.* Wisconsin inmate Nathaniel Lindell is no stranger to this court. Over the past three years, we have decided five appeals arising from three separate civil suits Lindell has brought against prison officials. *See Lindell v. O'Donnell*, 135 Fed. Appx. 876 (7th Cir. 2005) (unpublished order); *Lindell v. McCaughtry*, 115 Fed. Appx. 872 (7th Cir. 2004) (unpublished order); *Lindell v. Frank*, 377 F.3d 655 (7th Cir. 2004); *Lindell v. McCallum*, 352 F.3d 1107 (7th Cir. 2003); *Lindell v. Doe*, 35 Fed. Appx.

638 (7th Cir. 2003) (unpublished order). At least two more are pending. *See Lindell v. Huibregtse*, Case No. 05-4627 (7th Cir.); *Lindell v. Govier*, Case No. 05-2772 (7th Cir.). Most of these cases have involved First-Amendment claims based on Lindell's practice of Wotanism (a.k.a. "Odinism" or "Asatru"), a pagan religion often associated with a white-supremacist philosophy. *See* "Developments in the Law--In the Belly of the Whale:  Religious Practice in Prison," 115 Harv. L. Rev. 1891, 1903-04 (2002) (discussing adoption of pagan religions by white supremacist groups). Now, Lindell turns to the Eighth Amendment, claiming that Wisconsin's prison policy of randomly assigning cellmates placed him in harm's way.

In April 1999, Lindell was ordered to share a cell at the Waupun Correctional Institution with Antoine Delarosa. For various reasons, the two did not get along. For one thing, Delarosa was black, and Lindell was an outspoken white supremacist. For another thing, Delarosa was a member of the Gangster Disciples, and the word around the prison was that Lindell had recently assaulted another member of that gang. According to his complaint, Lindell "told numerous staff that he and Delarosa . . . were not getting along due to racial/cultural conflicts." He asked to be "moved into another cell by himself or with a prisoner [he] got along with" in order to avoid the possibility of a fight. His request was denied. A few days later, tensions between the two cellmates boiled over—Lindell made a comment about some music Delarosa was playing and Delarosa responded by attacking Lindell (this, of course, is Lindell's version of the events), punching him in the face. Adding insult to injury, Lindell then got written up for his involvement in the fight, which eventually led to a stint in segregation.

A similar scene played out in December 2000 when, despite his ongoing efforts to persuade prison officials not to house him with nonwhite inmates and others with whom

he did not get along, Lindell was assigned to a cell with Darrel Jenkins, who like Delarosa was black and a Gangster Disciple. Lindell again expressed his misgivings to a prison guard (identified in the complaint only as "Sgt. Burns"), telling the guard that he "was not supposed to be put in a two-man cell" and that he "didn't get along with blacks." Finding no documentation of any single-cell restriction, Sgt. Burns ordered Lindell to go to his assigned cell or be returned to segregation. Lindell declined segregation (an ironic term given Lindell's racial attitude) and went to the cell. This time a confrontation came more quickly—within 10 minutes Jenkins went after Lindell (again, Lindell's claim), injuring his face and (we cringe to think of it) biting off his thumbnail. Lindell again got sanctioned, but this time he was able to get the conduct report thrown out by a state court.

Lindell filed a blunderbuss complaint in the district court naming more than 40 prison officials and employees as defendants. Weighing in at 55 pages, Lindell's complaint[1] covered a lot of ground but focused primarily on the two episodes we have just described. He alleged that in double-celling him with Delarosa and Jenkins, prison officials were deliberately indifferent to a substantial risk of serious harm, in violation of the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994). He also alleged that the medical care he received for his injuries was inadequate and that the discipline he received was retaliatory, but those claims are not developed in this appeal, so we will not discuss them.

Screening the complaint pursuant to 28 U.S.C. § 1915A, the district court concluded that although Lindell did not

---

[1] Lindell's complaint was probably dismissable for not being "simple, concise and direct" (see Rule 8(e) of the Federal Rules of Civil Procedure). District courts should not have to read and decipher tomes disguised as pleadings.

have a right to be celled with an inmate of a particular race, or even one with whom he "got along," his complaint did state a claim that Sgt. Burns was deliberately indifferent to a known hazard when he ordered Lindell into the cell with Jenkins. But eventually, when Sgt. Burns moved for summary judgment, the court found insufficient evidence of an Eighth-Amendment violation. There was no evidence that Jenkins threatened Lindell before the attack or that Lindell made Sgt. Burns aware of any particular threat from Jenkins. And although Lindell had previous run-ins with Gangster Disciples, the most recent one was more than 18 months earlier—too remote to put Sgt. Burns on notice of any clear and present danger. So the court granted summary judgment in favor of Sgt. Burns.

Lindell now argues that there was sufficient evidence from which a jury could find that Sgt. Burns knew of and ignored the risk involved in placing Lindell in a cell with Jenkins—specifically, evidence that Burns knew of Lindell's history with the Gangster Disciples and evidence that Lindell told Burns that he was afraid of Jenkins in particular. But prison guards are not required to believe every profession of fear by an inmate. "[P]risoners may object to potential cellmates in an effort to manipulate assignments, or out of ignorance; thus although a protest may demonstrate risk it does not necessarily do so." *Riccardo v. Rausch*, 375 F.3d 521, 527 (7th Cir. 2004). Sgt. Burns may have had particular cause for skepticism, given Lindell's own professed distaste for being housed with blacks and his claim that he was "not supposed to be put in a two-man cell" despite the absence of any such restriction in his cell-placement documentation. And although Burns may have known of Lindell's earlier confrontations with the Gangster Disciples, we agree with the district court that given "[t]he passage of time"—the year and a half since the earlier incident—and "the absence of evidence describing specific threats" from Jenkins or other members of the gang, there

was no compelling reason for Burns to believe that Lindell was at serious risk.

Lindell also argues that the court erred by allowing him to pursue his Eighth-Amendment claim only in connection with the December 2000 attack. He insists that he also stated a claim that prison officials were deliberately indifferent to his safety when they kept him double-celled with Delarosa in April 1999 despite the well-known tension between him and the Gangster Disciples. But according to Lindell's complaint, when he told prison officials he wanted to be moved out from the cell with Delarosa it wasn't because of a threatened assault. Rather, he wanted to be "moved into another cell by himself or with a prisoner [he] got along with" because he and Delarosa were experiencing "racial/cultural conflicts." The court reasonably construed this part of Lindell's complaint as asserting a right to be housed with members of his own race, culture, or temperament, and correctly concluded that the Constitution created no such right. Quite the contrary, in fact. *See Johnson v. California*, 543 U.S. 499 (2005) (requiring strict scrutiny of racial segregation of inmates).

Finally, Lindell argues that the court abused its discretion by refusing to appoint a lawyer to help him prosecute his case. We don't doubt that having a lawyer might have been helpful, but Lindell is as experienced in litigation as any jailhouse lawyer in our recent memory, and we see nothing in this case that strikes us as beyond his capacities. More to the point, as the district court observed, if Lindell had difficulty prosecuting this case it was largely because of the other cases he has chosen to pursue at the same time—each case typically involving dozens of claims against dozens of defendants and requiring enormous expenditure of effort by courts, defendants, and Lindell himself. The court was justified in expecting Lindell to live with the consequences of his own actions.

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*