NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted March 8, 2011*
Decided March 9, 2011

*Before*

RICHARD A. POSNER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 09-3401

| | |
|---|---|
| RICKY YOUNG, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Illinois, |
| | Eastern Division. |
| *v.* | |
| | No. 07 C 1193 |
| THOMAS MONAHAN, et al., | |
| *Defendants-Appellees.* | Harry D. Leinenweber, |
| | *Judge*. |

**O R D E R**

Ricky Young is civilly committed by the State of Illinois as a sexually violent person. Young sued certain officers and employees at his former treatment facility after he was assaulted by his cellmate. He claims that the defendants violated his constitutional rights under the Fourteenth Amendment by failing to prevent the attack. He also contends that facility employees violated his rights under the Equal Protection Clause by treating him

---

*After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2)(C).

differently than similarly situated white residents. The district court granted summary judgment for the defendants on both claims, and we affirm.

Young never submitted a proper statement of material facts as required by Rule 56.1 of the local rules for the Northern District of Illinois, so the district court adopted the facts as set forth by the defendants in their submission. This was appropriate, and we recap the facts as adopted by the district court, viewing them in a light most favorable to Young. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

Young is committed under the Illinois Sexually Violent Persons Act; during the relevant time period, he was housed in a treatment and detention facility in Joliet, which is operated by the Illinois Department of Human Services ("DHS"). This appeal turns on the circumstances surrounding an attack that Young suffered at the hands of his cellmate ("D.M.") moments after reporting a fight between D.M. and another resident. Young was on his way back to his cell when D.M. assaulted him, pushing him into the cell and closing the curtain before pummeling him in the head and face. Security promptly intervened and Young was taken to the health unit, where he was treated for swelling and a cut lip. His pain lasted several weeks.

Both Young and D.M. had resided at the Joliet facility for some time before they were assigned to share a cell. As residents of the same housing unit, they shared a cafeteria and a dayroom, and Young said that on several occasions he helped D.M. with homework assignments from a therapy group. In those early days, they had no history of violence, though Young testified that they had their share of arguments and that D.M. had twice threatened to hurt him.

Before the cell assignment, Young had not filed a formal grievance expressing concern about D.M.'s aggression. In fact, Young had mentioned D.M. to a facility employee only once: during a therapy session with Dr. Judy Roth, Young recounted an argument he had with D.M that ended with D.M. threatening to punch him in the mouth.

It was only after he learned of the cell assignment from Dr. Mark Brenzinger, another one of his therapists, that Young voiced concern for his safety. Young shared his concerns with Dr. Brenzinger, but Dr. Brenzinger disclaimed any involvement in the cell assignment, explaining that he was merely relaying the news. Young then approached Larry Moore, a DHS "security therapy aide," to request a different cellmate. Two other defendants, Dr. Scott Maieritsch, a therapist, and Steve Strock, a DHS administrator, were in Moore's office at the time and told Young they would look into finding him another cellmate. For his part, Moore spoke with D.M. about Young's concerns, and according to Young's deposition testimony, received assurances from D.M. that he had no intention of harming Young.

Young refused to leave his room on the scheduled move-in date. When he was approached by Tony Humphrey, another DHS security therapy aide, Young again complained that he felt unsafe because of threats D.M. had made in the past. Humphrey radioed Terry Williams, a DHS internal-affairs investigator, who told Humphrey to move Young's belongings into the cell. When Young again protested, Williams had his belongings moved, leaving Young behind, locked in an empty cell. Young was let out that evening by defendant Franzen, a security-aide supervisor, who told him that he could retrieve his belongings from D.M.'s cell but that doing so would be viewed as consenting to the move. Young moved in the following day. The record is silent as to what, apart from his opposition to the move, Young told Franzen and Williams about his relationship with D.M.

Roughly a week into the move, Young complained to Dr. Maieritsch that D.M. was being "dominant" over the use of common space in the cell, placing furniture in the middle to obstruct Young's path, and dictating when Young could use the radio and when he could come and go. Dr. Maieritsch told Young to wait 30 days; if the situation did not improve, Young would be moved out of the room.

Meanwhile, Dr. Brenzinger had been monitoring the rooming situation in his therapy sessions with Young. Session logs in the weeks following the move show that they discussed the subject regularly. The logs also reflect that Young had begun to accept the arrangement. One progress note reports that Young told Dr. Brenzinger that he was adjusting to his roommate and that "things are going better." Dr. Brenzinger arranged for a sit-down meeting with Young and D.M., but it was cut short when Young grew frustrated and stormed out. Young then returned to his cell and removed his belongings—an outburst that led him to be moved temporarily to a different housing unit and placed on "close management status."

Young returned to his cell roughly a week later. The month leading up to the assault passed without trouble, he testified, save for one incident in which D.M. threatened him because he thought Young had faked an injury in order to get assigned the bottom bunk. Young mentioned the incident to Dr. Lea Chankin, a member of the facility's rooming committee, who instructed Young to submit a formal grievance to her committee. He did, and his request for a new cellmate was denied.

Dr. Chankin testified that the rooming committee denied Young's grievance, which had been filed on a non-emergency basis, on grounds that Young neither demonstrated an immediate threat nor obtained supporting statements from his therapists. Dr. Chankin explained that cell assignments were fraught with complications, as administrators must

weigh reported threats against the risk that inmates are attempting to game the rooming committee.

In this suit under 42 U.S.C. § 1983, Young asserts that employees at the Joliet facility willfully disregarded a substantial likelihood that violence would result from his cell assignment. He contends that the cell assignment should never have been made, and that once it was, facility officials should have heeded his objections and reassigned him. He identifies defendants Roth, Brenzinger, Strock, Williams, Humphrey, Moore, Franzen, Maieritsch, and Chankin as individuals who knew of the danger yet failed to address it. Young also asserts that several defendants discriminated against him and other black residents in housing and disciplinary decisions.

The district court granted summary judgment for all defendants. In resolving Young's failure-to-protect claim, the court examined the conduct of the defendants at various stages: their decision to assign Young and D.M. to the same cell, their response once Young learned of the assignment and complained, and their decision after he moved in not to reassign him elsewhere. The record, the court concluded, could not support a finding at any of these stages that the defendants acted with reckless disregard of a serious risk of harm. The court also entered summary judgment against Young on his equal-protection claims, concluding that he lacked evidence establishing that administrators treated black residents less favorably than similarly situated white residents.

On appeal Young challenges the grant of summary judgment on his failure-to-protect claim. He does not address any of the district court's specific conclusions, but instead recounts his version of the facts and recites the particular constitutional rights he claims were violated. He maintains, for example, that D.M.'s threats were serious and imminent; that several of the defendants knew an assault was likely but nevertheless acquiesced in the cell assignment; and that a reasonable jury could find culpable any defendant who knew of the threats yet refused to protect him.

We analyze the claim under the Fourteenth Amendment's Due Process Clause, as opposed to the Eighth Amendment, because Young is civilly committed. *See Guzman v. Sheahan*, 495 F.3d 852, 856 (7th Cir. 2007). The right to be free from cruel and unusual punishment applies with equal force in the civil context, *Miller v. Dobier*, No. 10-1829, 2011 WL 477046, at *2 (7th Cir. Feb. 11, 2011); *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008), and both the Fourth and Fourteenth amendments require the government to protect inmates from violent assault. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Klebanowski v. Sheahan*, 540 F.3d 633, 637 (7th Cir. 2008). An official violates that duty "only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. However, a general risk of violence is not

enough, as a certain degree of danger is unavoidable in a detention facility. *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005).

We agree with the district court that defendants were entitled to summary judgment. Although specific facts showing that a defendant's awareness of a risk of harm are sufficient to defeat summary judgment, *Peate v. McCann*, 294 F.3d 879 (7th Cir.2002), "prison guards are not required to believe every profession of fear by an inmate." *Lindell v. Houser*, 442 F.3d 1033, 1035 (7th Cir. 2006); *see also Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (noting that likelihood of actual knowledge of impending harm decreases as the vagueness of the threat increases); *Riccardo v. Rausch*, 375 F.3d 521, 527-28 (7th Cir. 2004) ("A prisoner's bare assertion is not enough to make the guard subjectively aware of a risk, if the objective indicators do not substantiate the inmate's assertion.").

Turning to the first stage in the district court's chronology, we agree that Young's conversation with Dr. Roth months before the cell assignment could not support a showing of deliberate indifference. Young's main charge against Dr. Roth amounts to a claim that she should have known the cell assignment was dangerous, not that she did know. But the threat from D.M. that Young reported to Dr. Roth was vague and had been made months before, and Young's complaints were not so specific as to suggest a high probability of an assault. *See Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (upholding summary judgment for defendants on failure-to-protect claim where prisoner "told jail officials only that he was afraid and that he wanted to be moved"); *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003) (guard's knowledge from plaintiff of cellmate's veiled, nondescript threat did not support inference of reckless disregard). Nor had D.M. acted on his threats when he lived in the same housing unit as Young in the months leading up to the cell assignment. *See Nelson v. Shuffman*, 603 F.3d 439, 447 (8th Cir. 2010) (noting that assailant's past conduct is probative of whether he posed risk to victim).

Young's claim fares no better at the second stage of the chronology, when he learned of the cell assignment and expressed his concerns to facility employees. Here too Young's complaints about past threats from D.M. were inadequate to alert defendants to impending harm. Moreover, as the district court observed, the record belies Young's contention that the defendants involved at this stage disregarded his professions of fear. Defendant Moore approached D.M. about Young's concerns and obtained his assurance that Young would not be harmed. Dr. Brenzinger, too, was proactive, monitoring the situation from his therapy sessions and arranging for a sit-down meeting between Young and D.M. Even defendants Maieritsch and Strook, whose involvement was limited to brief conversations with Young, took notice of Young's concerns and promised to look into a new cell assignment.

Young's claim gets weaker still at the final stage, the period leading up to the assault, after Young moved into the cell with D.M. Indeed, the risk of violence appeared to diminish over time, as Young's complaints turned to more mundane subjects—disputes over placement of furniture, for instance—and reports from his therapy sessions demonstrated that he was adjusting to the new arrangement. Moreover, relations between Young and D.M. were improving, and Young told Dr. Brenzinger that he was adjusting to the new cell. Another verbal threat from D.M. was made during this period, the culmination of a heated argument over Young's use of the bottom bunk, but Young mentioned it to only one employee, Dr. Chankin, who after reviewing his request to transfer cells determined that the threat did not warrant reassignment. Dr. Chankin submitted an affidavit explaining the basis for her decision. Young failed to address the affidavit, and his bare assertion that Dr. Chankin knew about the threat is not enough to make her aware of the risk. *See Riccardo*, 375 F.3d at 527-28.

Lastly, Young renews his contention that several defendants violated his right to equal protection. He asserts generally that evidence introduced at summary judgment shows that the rooming committee is inclined to grant white residents' requests over those of black residents and that black residents are "punished more harshly" than white residents for rule violations.

Here too Young fails to address the basis for the district court's judgment. The court determined that defendants were entitled to summary judgment because Young did not contest Dr. Chankin's declaration that his cellmate requests were denied based on the rooming committee's concern about his sexually acting out with proposed cellmates. Young points to no evidence to call the court's determination into question. Nor has he pointed to evidence to contest the court's other ruling that he failed to substantiate his claim that black inmates were treated more harshly than white inmates. Young introduced affidavits from other inmates who make similar assertions about disparate treatment, but the conclusions in the affidavits were not supported by specific occasions where black inmates were treated more harshly than similarly situated white inmates. As the district court recognized, Young cannot survive at summary judgment by substituting conclusory allegations in the complaint with conclusory allegations from affidavits. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003).

AFFIRMED.