MANION, Circuit Judge,
concurring in part, dissenting in part.
I concur with the court’s conclusion that, at this early stage of the proceedings, defendants Nickel, Tobiasz, Millard, and Severson should not be granted qualified immunity. As I see it, however, the remaining defendants (Bath, Boodry, Herb-rand, Johnson, and Quade) are entitled to qualified immunity. Therefore, I concur in part and dissent in part.
Jessie Miller led a tragically short and troubled life. Exposed to cocaine while in útero, Miller was born into a broken home on December 3, 1987. He soon became a ward of the state and spent his childhood years rotating through 54 foster homes. Miller was also physically and sexually abused and, not surprisingly, developed numerous mental health issues. He jumped from the top of a three-story building at age 16, which signaled the genesis of what would become a veritable obsession with suicide attempts and ideation. Those attempts appeared to increase in frequency and severity after Miller was incarcerated, culminating in his final, successful attempt at the Columbia Correctional Institute (“CCI”) on June 22, 2009.
As the court correctly notes, at this preliminary stage we must determine whether the plaintiff has pleaded “sufficient factual matter, accepted as true, to ‘state a claim *992 to relief that is plausible on its face.’” Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The court correctly recites the qualified-immunity standard; that is, we must determine whether a constitutional right was violated and whether the right in question was clearly established at the time of the incident. Pearson v. Callahan, 555 U.S. 223, 232, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
The plaintiff claims that the defendants subjected Miller to cruel and unusual punishment under the Eighth Amendment, as applied to the states by the Fourteenth Amendment. Specifically, the plaintiff claims that the defendants deprived Miller of proper supervision and care. The Supreme Court has recognized that certain deprivations fall under the cruel-and-unusual rubric. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A deprivation claim has two elements, one objective and one subjective. First, the deprivation must be, objectively, sufficiently serious. Second, the prison official’s subjective state of mind must have been one of deliberate indifference to an inmate’s health or safety. Sanville v. McCaughtry, 266 F.3d 724, 733 (7th Cir.2001).
There is no question that the first element was sufficiently pleaded. We have held elsewhere that the risk of suicide is a serious harm. Id. Therefore, where prison officials deprive a prisoner who has known suicidal tendencies of the necessary medical and preventive care, and then that prisoner actually commits suicide, the prisoner has suffered a serious harm and thus “clearly satisfies the first element.” Id. The second element, however, requires a more in-depth analysis. We must look at each defendant to determine whether the plaintiff has sufficiently pleaded that they were deliberately indifferent to Miller’s health and safety. In doing so, the court must apply the following standard:
“[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.”
Farmer, 511 U.S. at 837, 114 S.Ct. 1970. The question, then, is whether the plaintiff has sufficiently pleaded facts that support allegations that each official subjectively knew that there was a substantial risk that Miller would commit suicide, yet failed to take reasonable steps to prevent him from doing so. Sanville, 266 F.3d at 737.
As the court carefully notes, the plaintiff has pleaded sufficient facts to show that Nickel and Tobiasz were aware, or should have been aware, of Miller’s condition and that they recognized his need for heightened care and scrutiny. Therefore, the court correctly affirmed the district court’s denial of qualified immunity. Perhaps Millard and Severson did not have the same detailed knowledge of Miller’s condition, but it is reasonable at this stage of the proceedings to impute knowledge of Miller’s suicidal tendencies to those two officers who were on patrol in the area of the prison where Miller was incarcerated — Housing Unit 7 of the Special Management Unit — just before and at the time Miller’s suicide occurred. I agree that the plaintiffs have pleaded sufficient facts that, taken as true, could indicate a failure of either or both of them to prevent Miller’s suicide. Therefore, I join the court’s opinion to deny qualified immunity to Millard and Severson at this preliminary stage.
*993 But it is clear from the pleadings and the attached documentation that defendants Bath, Boodry, Herbrand, Johnson, and Quade were not patrolling Housing Unit 7 on the night that Miller committed suicide. Rather, those defendants were assigned to other areas of CCI and only responded after Severson placed an emergency radio call after he found Miller unresponsive in his cell. The complaint contains no allegation that these response team officers even knew of Miller’s existence — let alone his suicidal tendencies.
Yet the court imputes the same knowledge to the response team officers as it did to Millard and Severson simply because the complaint alleges that the response team officers knew or should have known of Miller’s suicidal tendencies and the related warning signs. (Op. at 990.) That is not a plausible allegation, and the court should ignore it. We require “actual knowledge” on the part of prison officials to satisfy the subjective component of a deprivation claim. Sanville, 266 F.3d at 737. We may impute actual knowledge to prison officials “[i]f ‘the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it.’ ” Id. (quoting Farmer, 511 U.S. at 842, 114 S.Ct. 1970). But the complaint does not point to any such circumstance in this case. The court’s opinion would require prison security guards to have knowledge of every single inmate’s health issues in the entire facility — even those in areas of the facility that the officers are not patrolling. Moreover, prison security guards would need to gain that knowledge almost immediately on an inmate’s transfer into the facility (recall that Miller committed suicide a mere three days after transferring to CCI). A fair reading of the “actual knowledge” standard does not stretch a security guard’s responsibility that far.
But even if the response team officers could be charged with some knowledge of Miller’s suicidal tendencies, the plaintiff still has not sufficiently pleaded that those officers acted unreasonably. The essence of the plaintiff’s allegations against the response team officers is that the officers failed “to react quickly upon seeing an inmate with a bed sheet wrapped around his neck.” The pleadings and supporting documentation do not support this conclusory assertion.
It is undisputed that Severson placed an emergency radio call at 11:58 p.m. on June 22, 2009, informing other officers that Miller was laying unresponsive in his cell. Officers Quade, Bath, Herbrand, and Boo-dry responded to Housing Unit 7 within a few minutes of this call. On arrival, Bath briefly returned to the control room to get a rescue knife while Boodry retrieved a plexiglass shield. Within four minutes of receiving the radio call, the officers performed an “emergency cell entry,” securing Miller’s body with restraints while cutting away the ligature from around his neck. All of this occurred without waiting for Johnson — the senior officer — who arrived on the scene at 12:07 a.m.
The plaintiff complains that the officers took too long to enter Miller’s cell, alleging that Bath’s and Boodry’s retrieval of the rescue knife and plexi-glass shield caused an undue delay in reaching the unresponsive Miller. Further, the plaintiff alleges that the officers acted unreasonably in their attempts to prevent Miller’s suicide because they restrained Miller before cutting away the ligature. Neither of these allegations; taken as true, supports the argument that the response team officers acted unreasonably. As we have noted elsewhere, “[a]ll that can be expected is that guards act responsibly under the circumstances that confront them.” Riccardo v. Rausch, 375 F.3d 521, 525 (7th Cir. *994 2004). This necessarily requires guards to “discriminate between serious risks of harm and feigned or imagined ones, which is not an easy task given the brief time and scant information available to make each of the many decisions that fill every day’s work.” Id. Because the alleged time period between the emergency radio call and the response team’s entry into Miller’s cell was so short, and the officers’ alleged actions that caused the minor delays were eminently reasonable and necessary to ensure the officers’ (and Miller’s) safety, the plaintiff has failed to plead sufficient facts that, even taken as true, could plausibly show that the response team officers failed to take reasonable steps to prevent Miller’s suicide.
In sum, I concur with the court’s conclusion that defendants Nickel, Tobiasz, Millard, and Severson are not entitled to a qualified-immunity defense at this stage of the proceedings. But based on the foregoing analysis, the response team officers— Bath, Boodry, Herbrand, Johnson, and Quade — are entitled to qualified immunity. Therefore, I respectfully dissent from that part of the court’s opinion.