In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1057

DAVID C. GEVAS,

*Plaintiff-Appellant*,

*v.*

CHRISTOPHER MCLAUGHLIN, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:08-cv-01379-JBM-JAG — **Joe Billy McDade**, *Judge.*

ARGUED JUNE 4, 2015[*] — DECIDED AUGUST 20, 2015

Before BAUER, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* While David Gevas was imprisoned
at the Henry Hill Correctional Center in Galesburg, Illinois, his

[*] This appeal was initially submitted for decision on the briefs and the
record. *See* Fed. R. App. P. 34(a)(2). Upon consideration of the appeal,
however, the panel concluded that it would benefit from re-briefing and
oral argument. Counsel was appointed to represent Gevas (who initially
had briefed the appeal *pro se*) for these purposes.

cellmate stabbed him in the neck with a pen. Gevas filed a *pro se* complaint against three prison officials, alleging *inter alia* that they violated the Eighth Amendment's proscription against cruel and unusual punishment by failing to protect him from the attack. *See* U.S. CONST. amend. VIII, cl. 3; 42 U.S.C. § 1983.[1] That claim proceeded to a jury trial, at which Gevas was represented by appointed counsel. At the conclusion of Gevas's case in chief, however, the district court granted judgment as a matter of law to the officials on the ground that no reasonable jury could conclude that they were subjectively aware that Gevas was in danger. *See* Fed. R. Civ. P. 50(a). We reverse. Were a jury to credit Gevas's testimony that he alerted each of the defendants to his cellmate's threats to stab him, it could find that the defendants were aware of the danger posed to Gevas. The district court therefore erred in granting judgment as a matter of law to the defendants on that ground. We conclude further that neither of the alternative arguments advanced by the defendant officials would sustain the entry of judgment as a matter of law. The case will be returned to the district court for a second trial.

## I.

The case that Gevas presented in support of his Eighth Amendment claim consisted entirely of his own testimony. As judgment was entered against Gevas pursuant to Rule 50(a), we are obliged to assume the truth of his testimony and otherwise construe the record in the light most favorable to

---

[1] Certain other claims and defendants were disposed of prior to trial. Only the Eighth Amendment claim is at issue in this appeal.

him. *E.g.*, *Acevedo v. Canterbury*, 457 F.3d 721, 722 (7th Cir. 2006).

Gevas, who is serving a life sentence, was transferred to Hill from the Stateville Correctional Center on January 2, 2008. Upon completion of an orientation period, Gevas was assigned to a succession of different cells and cellmates in the general population of the prison. *See* R. 194 at 7.

Gevas testified that, in the months before the pen-stabbing incident, he had repeatedly complained to prison officials about certain cellmates that he believed posed a danger to him; and in March and April 2008, he filed grievances demanding that he not be celled with gang members. He was assigned to a new cell, with William Adkins, on May 17, 2008; but Adkins' mercurial and hostile temperament had Gevas "walking on egg shells." R. 231 at 11. Gevas testified that Adkins "wanted me out of his cell" and threatened on a daily basis to stab him, saying that Gevas was "not too big to bleed" and "not too big to be beaten up." R. 231 at 10-11. (We are told that Gevas has a stout physique.) According to Gevas, Adkins identified himself as a gang member and accused Gevas of snitching on a previous cellmate, John Taylor, who was also a gang member. Gevas testified that Adkins's behavior caused him to feel "very tormented, in fear for [his] life." R. 231 at 14.

Gevas discussed the situation with three prison staff members. First he spoke with Wayne Steele, his prison counselor, on May 22, five days after Adkins had become his cellmate. Gevas told Steele that Adkins was threatening to stab him. He asked Steele to put the two of them on a "keep-separate" list and, in Gevas's words, "begged for [Steele] to

move me." R. 231 at 15. Gevas also handed Steele a letter (and sent an identical follow-up letter through the prison mail on May 26) saying that Adkins had accused him of snitching on his previous cellmate and "constantly talks about his gang and stabbing me and wants me out of his cell." Plaintiff's Group Ex. 12. Second, the day after meeting with Steele, Gevas briefly saw Steve Wright, the acting warden of operations, as Wright was conducting one of his frequent walk-through inspections of the kitchen where Gevas was working as a cook. As there were other inmates present in the kitchen and Gevas had work to do, he spoke to Wright discretely. Gevas told Wright "as fast as [he] could" that Adkins had threatened Gevas (including Adkins's remark that he was "not too big to bleed") and expressed concern that he not be stabbed. R. 231 at 33. Third, Gevas met with Christopher McLaughlin, an internal affairs officer, who visited Gevas's cell two days later, on May 25. Gevas had a 10- to 15-minute discussion with McLaughlin in which he again described Adkins's threats and he asked to be placed in protective custody. McLaughlin advised Gevas that because Hill is a medium-security prison, no protective custody was available. Three days prior to and one day after this meeting, Gevas also sent to McLaughlin (through the prison mail) the same letters that he sent to Steele. Plaintiff's Group Ex. 14. (Re-typed copies of these letters were admitted into evidence.) Gevas testified that none of the three officials responded to the concerns he had raised about Adkins. McLaughlin had told Gevas that he would summon Gevas to the internal affairs office for a follow-up discussion, but that did not occur either.

On cross-examination, defense counsel elicited details about
a conversation that Gevas had with McLaughlin in late March
regarding a prior cellmate, Taylor.[2] Gevas acknowledged that
McLaughlin informed him on that occasion that he could
"refuse housing" if he believed he was in jeopardy from his
cellmate. We gather that an inmate refuses housing by declar-
ing to a prison official that he will not comply with his cell
assignment—in other words, that he will refuse to return to his
designated cell. Gevas understood that if he did refuse hous-
ing, he would receive a disciplinary ticket for disobeying an
order, be moved immediately to the prison's segregation unit
(and thus separated from Adkins), and remain there for a
period of 30 days (longer for subsequent offenses) while prison
officials investigated his refusal. "That's punishment," Gevas
opined. R. 231 at 50. "I'm being punished for being threatened
on top of it." R. 231 at 50. Gevas acknowledged that, when an
inmate receives a disciplinary ticket, "ultimately you get the
chance to go to the adjustment committee, which is a group of
staff that decide whether or not you had a good reason for
refusing housing … ." R. 231 at 51. But in his experience, the
odds of convincing the adjustment committee to exonerate him
of the disciplinary violation were not good. Gevas conceded
that he rejected "the option of refusing housing and being
separated from Mr. Adkins," and instead "chose to stay in the
cell with" him. R. 231 at 53-54. On re-direct, Gevas explained

---

[2]   Neither the context nor the timing of this conversation was established
by the questioning of Gevas at trial. However, the record otherwise makes
clear that this conversation took place on or about March 30, 2008, when
McLaughlin spoke with Gevas regarding a grievance he had submitted over
a prior cell assignment. *See* R. 176 at 10, 176-1 at 22; R. 187 at 3 ¶ 9.

that he did not want to go to segregation because he believed that he would lose his job in the prison kitchen (which, per his earlier testimony, would mean that he would spend 23 hours per day in his cell rather than 16 to 18 hours) and would have to speak with his terminally-ill mother through a glass barrier when she visited the prison.

On May 29, four days after Gevas spoke with McLaughlin, Adkins stabbed Gevas four times in the neck with a pen as Gevas was tying his shoes and preparing to exit their cell for dinner. Adkins then commenced throwing items in the cell at Gevas, until a guard arrived and took Adkins into custody. Gevas was escorted to the prison's health care unit, where a nurse cleaned the puncture wounds and gave him a tetanus shot. The wounds healed within two weeks, although Gevas testified that he experienced continuing anxiety as a result of the assault. Gevas testified that he also suffered an injury to his shoulder in the incident which caused him ongoing pain.

After Gevas rested his case, the defendant officials moved for judgment as a matter of law. They argued that they had responded reasonably to the reported threats by providing Gevas the opportunity to refuse housing and thereby avoid Adkins. In the alternative, they asked for qualified immunity because "there is no case law that says they have to give [Gevas] the way out of that cell that he wants; they [just] have to provide some way for him to get away from an inmate that is a danger. They provided that." R. 231 at 60-61. Gevas's lawyer replied that refusing housing was not a reasonable option, because Gevas "would lose his job and all visitation with his family members" in segregation. R. 231 at 61.

The district court granted judgment as a matter of law to the officials, *see* Rule 50(a), but not for the reasons they had argued. The court concluded that Gevas had not put forward sufficient evidence showing that the officials were subjectively aware of a serious risk of harm to him, *see Farmer v. Brennan*, 511 U.S. 825, 837-38, 114 S. Ct. 1970, 1979 (1994), and so could not prove that the officials violated the Eighth Amendment. R. 231 at 65-66. The court declined to additionally rest its decision on the officials' argument that their response to the danger—advising Gevas that he could refuse housing—was reasonable. The court pointed out that according to Gevas's testimony, refusing housing would expose him to punishment; and the court was not prepared to say that Gevas was required to do that in order to separate himself from Adkins. R. 231 at 67. Gevas's subsequent request for a new trial was denied.

## II.

Gevas argues on appeal that he presented enough evidence to permit a reasonable jury to find that the officials actually knew that he was in danger, and that the district court erred in finding otherwise when it granted judgment as a matter of law to the defendants. Gevas further contends that the alternate grounds on which the officials defend the judgment are not meritorious. The option of refusing housing was not a reasonable response to the threat that Adkins posed, Gevas reasons, because it required him to commit a disciplinary infraction and expose himself to punishment in order to separate himself from a cellmate whose threats he had reported to the officials. Nor are the defendants entitled to qualified immunity, he argues, because no prison official could have reasonably believed that requiring a prisoner to commit a disciplinary

infraction was an adequate response to the threat posed by his cellmate.

A prison official is liable for failing to protect an inmate from another prisoner only if the official "knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979. A claim that a prison official was deliberately indifferent to such a risk has both an objective and a subjective component. *Id.* at 834, 114 S. Ct. at 1977. First, the harm to which the prisoner was exposed must be an objectively serious one. *Ibid.* There is no dispute that the threat of which Gevas was complaining (being stabbed by his cellmate) meets this criterion. *See, e.g., Brown v. Budz*, 398 F.3d 904, 910 (7th Cir. 2005) ("a beating suffered at the hands of a follow detainee … clearly constitutes serious harm"). The parties' dispute instead focuses on the subjective prong of the deliberate indifference claim, which requires that the official must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979. Although this inquiry focuses on an official's subjective knowledge, a prisoner need not present direct evidence of the official's state of mind: "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence … ." *Id.* at 842, 114 S. Ct. at 1981.

"In failure to protect cases, '[a] prisoner normally proves actual knowledge of impending harm by showing that he

complained to prison officials about a specific threat to his safety.'" *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (per curiam) (quoting *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991), *overruled on other grounds by Farmer*); *see also Gidarisingh v. Pollard*, 571 F. App'x 467, 470 (7th Cir. 2014) (non-precedential decision); *James v. Milwaukee County*, 956 F.2d 696, 700 (7th Cir. 1992); *Santiago v. Walls*, 599 F.3d 749, 769 (7th Cir. 2010) (Sykes, J., dissenting) ("Each defendant's state of mind is inferred primarily from the circumstances surrounding the assaults in question and the grievances Santiago filed alerting prison officials to his complaints about [his assailants]."); *cf. Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999) (knowledge that plaintiff was being deprived of food and medication established by prisoner's letters). Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger. *See, e.g., Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("[The prisoner's] vague statement that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play."); *Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (beyond expressing fear for his life, prisoner's statements to guards did not identify who was threatening him or what the threats were); *Grieveson v. Anderson*, 538 F.3d 763, 776 (7th Cir. 2008) (prisoner did not mention to guards that he was perceived to be a "snitch" or otherwise apprise them of a specific threat to his life); *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (prisoner only stated vaguely that he was "having problems" in his cellblock and "needed to be removed"). Nor will complaints that are contra-

dicted by the prisoner himself suffice to establish knowledge. *See, e.g., Riccardo v. Rausch*, 375 F.3d 521, 527 (7th Cir. 2004) (prisoner initially expressed mortal fear of harm at hands of cellmate, but subsequently indicated to guard he had no concern). By contrast, a complaint that identifies a specific, credible, and imminent risk of serious harm and identifies the prospective assailant typically will support an inference that the official to whom the complaint was communicated had actual knowledge of the risk. *See, e.g., Haley v. Gross*, 86 F.3d 630, 643 (7th Cir. 1996) (prisoner advised sergeant, *inter alia*, that cellmate was intimidating him, acting strangely, had threatened that "something crucial was going to happen" if one of them was not moved, and was now "deadlocked" in cell, which restricted ingress to and egress from cell).

Gevas has adduced sufficient evidence that defendants McLaughlin and Steele knew he was in danger of being harmed by Adkins. He testified that he informed McLaughlin and Steele in person that Adkins had threatened to stab him. He also introduced into evidence re-typed copies of notes he had handed or mailed to the officials; the notes stated that Adkins had accused him of snitching on his prior cellmate and "constantly talks about his gang and stabbing me." Plaintiff's Group Exs. 12, 14. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (letters to prison administrators may support inference of knowledge, so long as prisoner "demonstrat[es] that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety'") (quoting *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979). In reviewing the district court's Rule 50(a) judgment, we must credit Gevas's testimony

as true; and by his account, he related to both McLaughlin and Steele a specific, repeated, imminent, and plausible threat to his safety: Gevas identified the individual threatening him (Adkins), the nature of the threat (that Adkins would stab him), and supplied context that rendered the threats plausible (including Adkins's remark that Gevas had "snitched" on a prior cellmate). *Cf. Dale*, 548 F.3d at 570 (although defendant officers "all implored [plaintiff] for details" of threat to his safety, he provided none). Given what was communicated to these defendants, a jury reasonably could infer that they not only had notice of facts from which they could infer that Gevas faced a serious risk of substantial harm from Adkins, but that they actually drew this inference, and were thus subjectively aware of the danger he faced. *See Haley v. Gross*, 86 F.3d at 642-43.

A jury could draw the same inference as to Wright. By Gevas's own telling, his interaction with Wright in the prison kitchen was quite brief; and Gevas did not follow up by sending a letter to Wright as he did with McLaughlin and Steele. Nonetheless, accepting Gevas's description of the encounter as accurate, Gevas did manage to apprise Wright that his cellmate was threatening to stab him. This was sufficient to communicate the essential nature of the threat to Wright and to support the inference that Wright, like McLaughlin and Steele, had actual knowledge of the threat that Gevas faced.

It is true that the defendants were not required to believe that Gevas was in danger. *See Riccardo*, 375 F.3d at 525 ("[g]uards … must discriminate between serious risks of harm and feigned or imagined ones"). For any number of reasons,

including information acquired in the course of any investigation into Gevas's complaints, the defendants might have concluded either that Gevas was not credible or that Adkins did not present a genuine threat to his safety. In other words, Gevas's testimony, even accepted as the truth, does not *compel* the finding that any of the defendants did draw the inference that Gevas faced a substantial risk of serious harm. But for purposes of Rule 50(a), the question is not whether the finder of fact was compelled to determine or would have determined that the defendants were actually aware of the danger, but whether it could have made that finding. For the reasons we have already articulated, Gevas's testimony would permit a jury to find that the defendants knew Adkins posed a substantial risk to his safety.

Gevas is not otherwise required to prospectively negate the defense case in order to survive a Rule 50(a) motion, as the district court seemed to think. *See* R. 231 at 65-66. What, if any, investigation the defendants did into the threats that Gevas reported, and what they may have subjectively concluded as to the credibility and gravity of the threats as a result of such investigation, are matters that are within their knowledge and will no doubt be presented in the defense case. Gevas is not required to anticipate and refute that showing before it is made. He need only present evidence from which their knowledge may be inferred, and he has presented such evidence. In any case, a determination of what the defendants actually knew will almost certainly turn on an assessment of each party's credibility, for rarely is there direct, let alone irrefutable, evidence of an individual's subjective mental state. *See Farmer*, 511 U.S. at 842, 114 S. Ct. at 1981; *see also Miller v. Ill.*

*Dep't of Transp.*, 643 F.3d 190, 196-97 (7th Cir. 2011); *United States v. Ramirez*, 574 F.3d 869, 877-81 (7th Cir. 2009); *United States v. Carrillo*, 269 F.3d 761, 769-70 (7th Cir. 2001); *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 227-28 (7th Cir. 1984).

All that the record includes at this stage of the litigation is what Gevas says he communicated to the defendants, and that account, which stands unrebutted and unimpeached, would support the requisite finding that the defendants were both on notice of the danger that Adkins posed to Gevas, and that they drew the inference that Gevas was at risk of being injured. The district court therefore erred in finding that Gevas had not produced sufficient evidence to support a judgment in his favor.

This leaves us with the defendants' first alternative contention—that even if they were aware of the danger that Adkins posed to Gevas, no reasonable jury could find that they recklessly disregarded that risk, because they had made available to Gevas a means of separating himself from Adkins. Some seven weeks earlier, when Gevas had filed a grievance expressing concern about a prior cellmate, McLaughlin had advised Gevas that he could always refuse his cell assignment and thereby trigger his transfer into disciplinary segregation for a period of thirty days. *See* n.2, *supra*. Gevas ultimately would have the opportunity to explain his refusal to an adjustment committee which in turn could, in the exercise of its discretion, deem his refusal justified. Gevas conceded, on cross-examination, that he was aware of this option; and in the defendants' view, the fact that there was a process by which Gevas could effectuate his own transfer out of his cell and that Gevas knew he had this option is enough to establish that they

had offered Gevas a reasonable form of protection from the threat posed by Adkins, if not the one he preferred. *See, e.g.,* *Guzman v. Sheahan*, 495 F.3d 852, 857 (7th Cir. 2007) (so long as officer responded reasonably to the risk, he cannot be said to have been deliberately indifferent, even if his response did not prevent harm from occurring) (quoting *Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002)).

One problem with this reasoning is its presumption that Gevas understood that it was up to him to exercise this option with respect to Adkins in particular. Our understanding is that when McLaughlin had mentioned the possibility of refusing housing, it was in the context of informing Gevas that his grievance regarding Taylor was being denied. Gevas thus understood that refusing housing was available as a last resort if prison officials were unwilling to help him. But, so far as the record reveals, the defendants had not yet communicated such a message to Gevas with respect to Adkins. Gevas had reported the threats Adkins had made, and as far as Gevas knew, the defendants were looking into them; certainly he had not been told that the defendants did not regard Adkins's threats (or his report of those threats) as credible and/or that they did not plan to intervene. Certainly Gevas understood that it was possible for him to refuse housing: he acknowledged that he was aware of this option and that he chose not to pursue it and instead remain in his assigned cell with Adkins. R. 231 at 53-54. But it is not clear that Gevas understood that he should take matters out of the defendants' hands and into his own by exercising this option *before* he knew whether the defendants would take his complaints about Adkins seriously.

A second and more important problem with the defendants' reasoning, on the current record, is that it places a burden on Gevas to commit a disciplinary infraction in pursuit of his own safety. Gevas understood that if he refused housing, he would be issued a disciplinary ticket, placed into the prison's disciplinary segregation unit, and later given the opportunity to explain himself to the adjustment committee, with no guarantee that the committee would find his refusal of housing justified. In the meantime, because he had committed a disciplinary infraction (and would be confined to disciplinary segregation while the infraction was investigated), Gevas believed he would lose his job in the prison kitchen and his visitation rights would be limited in the sense that he would only be able to interact with visitors through glass. And there would be no assurance that the adjustment committee ultimately would absolve him of the rules violation; if it did not, he could be subject to punishment including the loss of good-time credits. (By contrast, if officials instead had responded to Gevas's complaints by placing Adkins in administrative detention as a precautionary measure while they looked into his reported threats upon Gevas, it would have been considered a *non*-disciplinary placement. *See* 20 Ill. Admin. Code § 504.660(b)(2).) Gevas's understanding of the refusal-of-housing process and its consequences may or may not be accurate; but on this record, it stands unrebutted, as the district court recognized.[3]

---

[3] Gevas's understanding of the consequences of refusing housing is at least plausible. Some of our own cases suggest that the refusal of housing is treated as a disciplinary infraction. *See, e.g.*, *Smith v. Birkey*, 447 F. App'x

(continued...)

   Certainly a prisoner may be expected to behave reasonably with respect to the dangers that prison life invariably presents. But a prisoner is not obligated to commit a disciplinary infraction in pursuit of his own safety. Prisons are, by their very nature, disciplinary, liberty-restricting environments in which "safety and order are paramount concerns." *Volkman v. Ryker*, 736 F.3d 1084, 1092 (7th Cir. 2013); *see also Bell v. Wolfish*, 441 U.S. 520, 546, 99 S. Ct. 1861, 1878 (1979) (recognizing that "maintaining institutional security and preserving internal order and discipline are essential goals" in the prison setting). Prisoners are expected to follow orders and rules, not disobey them. It was the prison that placed Adkins and Gevas in a cell together; and once the defendants were made aware that Adkins was threatening Gevas, it was their obligation as prison officials to assess the reported danger and to take reasonable steps to address it if they found it to be a real one. The defendants may not attempt to transfer that obligation to Gevas by insisting that he go so far as to engage in insubordination in order to take himself out of danger. *See Young v. Selk*, 508 F.3d 868, 874 (8th Cir. 2007).[4]

---

[3] (...continued)
744, 745 (7th Cir. 2011) (non-precedential decision); *Walsh v. Mellas*, 837 F.2d 789, 792 (7th Cir. 1988); *Walsh v. Brewer*, 733 F.2d 473, 474 (7th Cir. 1984); *Redding v. Fairman*, 717 F.2d 1105, 1115-16 (7th Cir. 1983).

[4] The scenario Gevas has described must be contrasted with one in which prison officials respond to a threat by transferring an endangered inmate into administrative segregation for his own protection. The latter is a common safety measure, *see Borello v. Allison*, 446 F.3d 742, 749 n.2 (7th Cir. 2006) (citing *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)), and, although
(continued...)

For the same reasons, we reject, on the limited record before us, the defendants' followup contention that they are entitled to qualified immunity, a contention premised on the notion that it was reasonable for them to believe that Gevas's ability to refuse housing was a sufficient response to the danger even if, as we have concluded, it was not. As we have been saying, it is defendants who have the duty to protect a prisoner once they become aware he is in danger of assault by another prisoner, and this is a now well-settled aspect of Eighth Amendment jurisprudence. *See Farmer*, 511 U.S. at 832-34, 114 S. Ct. at 1976-77 (collecting cases). Imprisonment, after all, "strip[s] [prisoners] of virtually every means of self-protection and foreclose[s] their access to outside aid[.]" *Id.* at 833, 114 S. Ct. at 1977. Prisoners lack even a right to invoke self-defense in disciplinary proceedings when they have resorted to violence as a means of protecting themselves. *Rowe v. DeBruyn*, 17 F.3d 1047 (7th Cir. 1994); *see also Arce v. Indiana Parole Bd.*, 596 F. App'x 501, 503 (7th Cir. 2015) (non-precedential decision); *Jones v. Cross*, 637 F.3d 841, 847-48 (7th Cir. 2011); *Scruggs v. Jordan*, 485 F.3d 934, 938-39 (7th Cir. 2007). On the

---

[4] (...continued)

it may come with some additional restrictions on an inmate's liberty within the prison, *see Sandin v. Connor*, 515 U.S. 472, 115 S. Ct. 2293 (1995), is not considered to be a disciplinary placement. In this case, however, the placement was, by Gevas's account, presumptively disciplinary, exposing him to the possibility of punishment that might include the loss of good-time credits, for example. *See Hahn v. Murphy*, No. CV 07-1153-SVW(MAN), 2011 WL 9378180, at *20 n.12 (C.D. Cal. Sep. 23, 2011) (magistrate judge's report and recommendation), *adopted*, 2012 WL 5456385 (C.D. Cal. Nov. 1, 2012) (distinguishing *Young v. Selk*, *supra*, on this basis).

record before us, construed in the light most favorable to the plaintiff, the defendants were aware that Gevas was in danger of being harmed by Adkins, who was threatening to stab him, and yet did nothing to address that danger *other* than having previously made him aware that he had the option to refuse housing, be ticketed in response, and have himself transferred into disciplinary segregation. Expecting a prisoner to defy an order in pursuit of his own safety runs counter to the essential nature of incarceration as well as to cases emphasizing the need for order and discipline in the prison environment, *see Wolfish*, 441 U.S. at 547, 99 S. Ct. at 1878 (courts must grant "wide-ranging deference" to prison administrators vis-à-vis "policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security"); *Burton v. Ruzicki*, 258 F. App'x 882, 885 (7th Cir. 2007) (non-precedential decision) ("discipline in a correctional institution is 'essential if the prison is to function'") (quoting *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984)), and cases sustaining the imposition of discipline for a prisoner's refusal to comply with orders, including orders refusing housing assignments, *see Forbes v. Trigg*, 976 F.2d 308, 313-14 (7th Cir. 1992) (refusal to comply with oral order for urine test); *Redding v. Fairman*, *supra* n.3, 717 F.2d at 1115-16 (refusal of housing assignment based on race of cellmate); *Smith v. Roal*, 494 F. App'x 663, 664-65 (7th Cir. 2012) (non-precedential decision) (disobeying order to submit to handcuffing). A prison official could not logically believe, in view of the duty imposed on him by the Eighth Amendment, *Farmer*, and other deliberate indifference cases, that requiring a prisoner to violate a prison directive (including his cell assignment) is a reasonable

response to a substantial risk of the prisoner's cellmate attacking him. And the defendants may not now find refuge in the doctrine of qualified immunity simply because no case had previously rejected the specific defense that they have creatively fashioned, when the logic (or illogic) of that defense is so at odds with the respective duties that existing case law imposed on prisoner and prison official. *See Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011) (plaintiff is not invariably required to point to case with similar facts in order to demonstrate that right at issue was clearly established for purposes of qualified immunity; "the violation may be so obvious in light of law existing at the time that a reasonable person would have known that his or her conduct was unconstitutional") (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1023 (7th Cir. 2000)).

Certainly the defendants can find no support in *Riccardo* in this regard. The dissent in *Riccardo* took note of a prison policy that would honor a prisoner's request to be transferred out of his cell if he alleged a fear for his personal safety but that would also treat the request as a *potential* disciplinary violation: if a followup inquiry revealed that the prisoner had refused housing for no reason, the prisoner would at that time be issued a disciplinary ticket. 375 F.3d at 532 & n.5. The dissent cited that procedure simply to make the point that the prison had a means of dealing with prisoners who were manipulative or prone to "cry wolf" without cause. *Id.* at 532. In any case, *Riccardo* involved a different Illinois correctional facility (Centralia), and the transfer policy described in that case is markedly different from Hill's policy (as described by Gevas). Gevas's testimony suggests that Hill treats a refusal of housing as a *presumptive* disciplinary violation rather than a potential

one. The fact that he would be issued a ticket upon such a refusal attests to that. And the mere mention of the policy in *Riccardo* by a dissenter surely could not have given the defendants cause to believe that they might reasonably rely on a prisoner to resort to a forbidden form of self-help in order to remove himself from a dangerous situation and thereby subject himself to the prison disciplinary process.

We are, of course, dealing with a one-sided record, and further development of the facts may demonstrate that refusing housing was a more reasonable option than Gevas's testimony has made it out to be. For that reason, we decline Gevas's invitation to declare unreasonable as a matter of law giving an inmate who expresses concern for his safety the option of refusing housing and to direct the district court to so instruct the jury. Our more modest holding is tied to the limited facts presented by this record, construed favorably to Gevas.

A final word about certain discovery that was denied to Gevas in this case. Among other information, Gevas asked for prison records related to Adkins's institutional conduct, disciplinary history, and criminal history. The defendants objected to the request, principally on the ground that disclosure might jeopardize institutional security and expose Adkins to attack by other inmates. R. 27 at 19 ¶ 5; *see also* R. 34 at 3-4 ¶ 4. The district court sustained the objection and denied Gevas's motion to compel. Although the district court has broad discretion in resolving discovery objections, we believe that the court abused its discretion in denying Gevas's request *in toto*. Gevas was *pro se* at the time he sought this discovery, and he offered only boilerplate as justification in support of his

motion to compel. R. 27 at 3 ¶ 4. But Adkins's criminal record and institutional history is obviously relevant to the extent it documents his history of violence (or lack thereof). Presumably, that history would have been one of the very sources of information that a prison official would have consulted in investigating whether Adkins indeed posed a threat to Gevas; the history therefore potentially sheds light on the defendants' knowledge of any danger that Adkins posed to Gevas. Denying Gevas access to that information thus hinders his ability to establish any deliberate indifference on the part of the defendants. It may be that there are aspects of Adkins's records that are irrelevant to Gevas's claim or which might jeopardize institutional security or Adkins's own safety if the information fell into the hands of the wrong people. We agree with Gevas, however, that those concerns may be addressed by (1) the court's *in camera* review of the pertinent records to determine whether they reveal information relevant to Gevas's claim and should therefore be produced to Gevas and his counsel; and (2) the entry of an appropriate protective order to address any security concerns implicated by disclosure of any relevant portions of Adkins's disciplinary records—including one restricting the disclosure of certain information to Gevas's counsel alone, if the court deemed such a restriction necessary. The district court must revisit this discovery request on remand.

There are two other categories of documents as to which Gevas was denied discovery: documents concerning the defendants' disciplinary history and the existence of cells occupied by only one inmate in the wing in which Gevas was housed at the time of the attack. The defendants contend that

we lack jurisdiction to entertain Gevas's arguments as to these documents, because his notice of appeal specifically identified the order denying his motion to compel as an object of appeal only insofar as it concerned documents related to Adkins's disciplinary history. R. 247; *see Chaka v. Lane*, 894 F.2d 923, 925 (7th Cir. 1990). But Gevas is entitled to a liberal construction of the notice, *see JP Morgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 861-62 (7th Cir. 2013), particularly given that he prepared it without the assistance of counsel, *see Smith v. Grams*, 565 F.3d 1037, 1041-42 (7th Cir. 2009). These additional two categories of documents were dealt with in the same order that resolved Gevas's request for documents concerning Adkins' criminal history. Moreover, the notice of appeal also cited the final judgment that the district court entered against him pursuant to Rule 50(a), and the appeal of a final judgment is sufficient to bring before us all of the interlocutory orders leading up to that judgment. *See Librizzi v. Childrens Mem. Med. Ctr.*, 134 F.3d 1302, 1305-06 (7th Cir. 1998); *see also, e.g., Brown v. Health Care Serv. Corp.*, 606 F. App'x 831, 834 n.2 (7th Cir. 2015) (non-precedential decision) (appeal of final judgment is sufficient to bring up for review prior discovery orders). We are satisfied that we have jurisdiction to consider these other categories of documents. And we agree with Gevas that he was entitled to documents regarding prison cells that were occupied by only one other inmate at the time of the attack and the days leading up to it. The existence of such cells would have a bearing on the options available to the defendants to respond to the threat posed by Adkins: Gevas could, in theory, have been transferred to one of those cells. As for the defendants' disciplinary history, Gevas suggests that documents along this

line would be relevant to show that the defendants were prone to ignoring legitimate complaints. That sounds very much like a propensity argument of the sort prohibited by Federal Rule of Evidence 404(b), however. *Cf. Jones v. Hamelman*, 869 F.2d 1023, 1027 (7th Cir. 1989) (sustaining exclusion of testimony offered to establish a pattern of "callous indifference" toward protection of inmates by correctional officer). Gevas has not convinced us that the district court abused its discretion in declining to order the production of those documents.

### III.

For all of the reasons we have discussed, the district abused its discretion in granting the defendants' motion for entry of judgment as a matter of law in their favor. The judgment is REVERSED, and the case is REMANDED for re-trial. Prior to re-trial, the court should revisit the subject of discovery consistent with the observations we have made. We thank Gevas's appointed counsel, Kenneth J. Vanko, for his vigorous and effective advocacy on Gevas's behalf.