In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 18-1682

MATTHEW LABREC,

*Plaintiff-Appellant,*

*v.*

LINDSAY WALKER, *et al.,*

*Defendants-Appellees.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:16-cv-00774-jdp — **James D. Peterson,** *Chief Judge.*

———————————

ARGUED SEPTEMBER 17, 2019 — DECIDED JANUARY 24, 2020

———————————

Before FLAUM, ROVNER, and SCUDDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Matthew LaBrec brought an action
under 42 U.S.C. § 1983 against a number of Wisconsin Depart-
ment of Corrections employees, alleging that they violated his
rights under the Eighth Amendment of the Constitution.
Specifically, LaBrec, who is an inmate, alleged that the de-
fendants were aware that his cellmate posed a danger to him
and that they failed to protect him from that cellmate. The dis-

trict court granted summary judgment in favor of the defend-
ants and declined to exercise supplemental jurisdiction over
the state claims that LaBrec also brought. LaBrec now appeals
that grant of summary judgment. He also appeals the district
court's denial of his request for appointed counsel. We review
the court's grant of summary judgment de novo. *Sinn v. Lem-
mon*, 911 F.3d 412, 419 (7th Cir. 2018). As for the denial of the
request for counsel, we review the court's decision only for
abuse of discretion. *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir.
2014).

The plaintiff and defendants present different accounts of
what LaBrec communicated to them and to the doctors at Psy-
chological Services.  However, in considering the defendant's
motion for summary judgment, the district court was re-
quired to take all evidence, including reasonable inferences
from that evidence, in the light most favorable to the plaintiff.
*Sinn*, 911 F.3d at 419.  The facts underlying the Eighth Amend-
ment claim, in the light most favorable to LaBrec and credit-
ing his version over that of the defendants for the purpose of
the summary judgment motion, are as follows.

LaBrec was an inmate housed at Columbia Correctional
Institute, a maximum security institution. His conduct report
history included prior assaults on inmates and staff, and on
July 20, 2016, he was involved in an incident that resulted in
his transfer from General Population to the Restricted Hous-
ing Unit. In that incident, LaBrec threw a chair after he be-
came upset that his phone call was disconnected upon the ex-
piration of his allotted phone time, and began kicking and
pounding on the control center windows and refused to go
back to his cell. He received a conduct report for that incident
and was transferred that night to the Restricted Housing Unit

where he was placed in a cell with Patrick McNeely. McNeely was in the Restricted Unit following a conduct report for assault involving McNeely and his prior cellmate.

LaBrec was designated a "pair with care" inmate, which means that the security staff needed to take extra care in evaluating the choice of cellmates for him. Because of that status, the Psychological Services Unit was supposed to be consulted prior to assigning a cellmate with LaBrec, but that consultation never occurred before LaBrec was placed with McNeely. LaBrec informed the defendants repeatedly of his status as a "pair with care" inmate.

The morning following his transfer to the cell with McNeely, LaBrec demanded—and was allowed—to see Dr. Julia Persike in the Psychological Services Unit. LaBrec informed Persike that McNeely was talking about beating up his last cellmate and that LaBrec felt intimidated by it and did not feel safe with McNeely. LaBrec further told Persike that McNeely was "acting very unstable, he would get all worked up, talking really fast, shaking his head back and forth, raising his voice and cursing," and that McNeely was "acting crazy" and "displaying very erratic behavior." LaBrec Separate Appendix ("App."), LaBrec Prosposed Findings of Facts at A110 ¶ 5 and Declaration of LaBrec A121 ¶¶ 19, 20. Persike and LaBrec discussed both the safety issue and McNeely's history of methamphetamine use as reasons for moving LaBrec from that cell assignment.

Persike discussed with defendants Joshua Craft and Debra Wilson, who were correctional officers, his conversation with LaBrec and the concerns with LaBrec's cellmate situation. They then proposed a move to a different cell with a different cellmate. LaBrec asked them to move him as soon as possible

as he feared he was unsafe. Despite their assurance, however, he was not moved by the end of their day shift. LaBrec conveyed to defendants Jason Chatman, the second-shift sergeant, and correctional officer Dustin Meeker, who were working the night shift, that he was supposed to be moved and did not feel safe in the cell with McNeely. When it became apparent to LaBrec that he would not be moved that night, he had an anxiety attack and began crying and asking for help. Security staff called Psychological Services, and Dr. Schwenn came to LaBrec's cell and spoke with LaBrec. LaBrec asked to be pulled out of the cell to discuss the problem confidentially, but that request was denied so he spoke with Schwenn cell-side. LaBrec informed Schwenn that he did not feel safe in the cell with McNeely and that he was supposed to be moved. Schwenn asked LaBrec to be specific as to what would happen, and LaBrec explained he was unable to be more specific as he could not predict his cellmate's actions. No action was taken to transfer him to a different cell.

The following morning, LaBrec again sought help from Psychological Services, this time meeting with Dr. Dan Norge and conveying his concerns. LaBrec subsequently spoke with defendant Lindsay Walker, the Unit Manager, as part of a conduct report meeting, and again explained that he did not believe that he was safe in his cell with McNeely. Walker denies that LaBrec informed her that he felt unsafe, and states that if he had told her that he felt at risk of harm from his cellmate during that meeting, she would not have returned him to the cell. Throughout that time, LaBrec repeatedly informed the defendants that the "pair with care" protocol was not followed with his cellmate assignment.

LaBrec was not reassigned to a different cellmate, and at 2:30 a.m. on July 24—three days after the initial assignment to that cell—McNeely and LaBrec were involved in an altercation in their cell in which McNeely stabbed LaBrec with a pen behind his left ear, in the back, and in his left shoulder. Both inmates received conduct reports for the assault, and McNeely was transferred to the most restrictive housing unit, RHU-1, whereas LaBrec remained in a cell in the mid-level restricted housing, RHU-2. A search of the cell following the assault revealed a note from McNeely in which McNeely set forth his intention to stab LaBrec.

It is well established that prison officials face a duty to protect prisoners from violence at the hands of other prisoners and that the failure to protect can violate the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). The prohibition against cruel and unusual punishment in the Eighth Amendment "obligates prison officials to 'take reasonable measures to guarantee the safety of … inmates.'" *Sinn*, 911 F.3d at 419, quoting *Farmer*, 511 U.S. at 832.

A prisoner seeking to establish a violation of that Eighth Amendment right must show that the prison official was deliberately indifferent to an excessive risk to the prisoner's health or safety, which includes both an objective and subjective component. *Id.*; *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015); *Farmer*, 511 U.S. at 838. First, the harm to which the prisoner was exposed must be an objectively serious one. *Sinn*, 911 F.3d at 419. The parties do not dispute that this criterion is met. Second, the prison official must have actual, not merely constructive, knowledge of the risk to be liable. *Id*. This requires that the official "'must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw that infer-
ence.'" *Gevas*, 798 F.3d at 480, quoting *Farmer*, 511 U.S. at 837;
*Sinn*, 911 F.3d at 419. "Whether a prison official had the req-
uisite knowledge of a substantial risk is a question of fact sub-
ject to demonstration in the usual ways, including inference
from circumstantial evidence … and a factfinder may con-
clude that a prison official knew of a substantial risk from the
very fact that the risk was obvious." *Farmer*, 511 U.S. at 842;
*Gevas*, 798 F.3d at 480. Because a prison official's duty under
the Eighth Amendment is to ensure "reasonable safety,"
prison officials who actually knew of a substantial risk to in-
mate health or safety can nevertheless escape liability if they
responded reasonably to the risk, whether or not the harm
was ultimately averted. *Farmer*, 511 U.S. at 844-45.

Only the second part of the test is at issue here, which is
whether LaBrec failed to present sufficient evidence to allow
the inference that the prison officials had the requisite
knowledge to act with deliberate indifference. The district
court concluded that the allegations of the threat to LaBrec
were too vague and generalized to meet that standard be-
cause LaBrec failed to explain why he felt unsafe.

The court considered, in turn, the evidence that McNeely
had assaulted his prior cellmate, that LaBrec was classified as
a "pair with care" prisoner, that LaBrec told the defendants
that he did not feel safe and McNeely was acting crazy, and
that McNeely wrote a note to officers that stated that he was
going to stab LaBrec. First, the court stated that even if it as-
sumed that all the defendants were aware that McNeely had
assaulted his prior cellmate, that would not show the defend-
ants knew of a substantial risk that McNeely would assault
LaBrec as well. The court reasoned that many prisoners have

engaged in aggressive or violent behavior and therefore an assailant must have an unusually violent history to require prison officials to treat him specially. The court held that in general one previous fight is insufficient to indicate a prisoner was unusually violent. For its conclusion, the court relied on *Owens v. Hinsley*, 635 F.3d 950 (7th Cir. 2011), arguing that in *Owens* officials were not held liable even though they knew the same prisoners had been involved in an altercation earlier.

The court next considered LaBrec's status as a "pair with care" prisoner. The court questioned the significance of that status, stating that neither side suggested he was therefore a member of a vulnerable group. Even assuming, however, that LaBrec was a vulnerable prisoner, the court concluded that would not be enough to show that the prison officials knew that McNeely posed a substantial risk to LaBrec's safety.

The court then turned to LaBrec's communications of the threat to the defendants. The court deemed LaBrec's statement that he "did not feel safe" to be too generalized to convey a threat because LaBrec was not specific as to why he was not safe. The court contrasted LaBrec's statement with that of the plaintiff in *Gevas*, in which the plaintiff told the defendant that his cellmate had threatened that "something crucial was going to happen," and concluded that LaBrec's statements were not nearly as specific. The court concluded that a prisoner must explain the basis for the belief that he is in danger in order to distinguish cases in which the prisoner is simply discontented or paranoid. The court further dismissed LaBrec's statement that McNeely was "acting crazy," again noting that Labrec did not allege that he told the defendants anything specific about what McNeely was doing. The court further reasoned that "[w]ithout more context, a statement

that the cellmate was 'acting crazy' could mean nothing more than that the cellmate was engaging in irritating but harmless behavior." Dist. Ct. Op., LaBrec Opening Brief Appendix (hereinafter simply "Dist. Ct. Op.") at 9. The court concluded that it was no more informative than other statements courts have deemed too ambiguous.

The last evidence considered by the court was the discussions that LaBrec had with the nondefendant prison staff members such as Dr. Persike. The court stated that LaBrec had not cited any evidence that the information provided to Persike was communicated to the defendants, and therefore it was irrelevant. Similarly, the court did not consider the note found in the cell in which McNeely expressed his intention to stab LaBrec, because it was found only after the assault occurred.

Because we review de novo, we need not address the district court's opinion. *Grieveson v. Anderson*, 538 F.3d 763, 770 (7th Cir. 2008). But the defendants' arguments mirror the analysis used by the district court, and therefore we briefly address the reasoning to highlight some of the problems presented by the arguments not only in the district court's opinion but in the briefs. The conclusions of the district court are problematic in that the court considered each factor in isolation, rather than in combination with each other. As we will discuss, the overall context is the relevant focus, and that must include consideration of all of the factors as a whole rather than as discrete, independent components.

In addition, the court in analyzing our prior cases, dismissed evidence if it did not fit the fact pattern in those cases. Courts analyzing the fact patterns in prior cases must be careful not to interpret those cases as a checklist of the evidence

that must occur in each case. We held as much in *Sinn*, noting that we are not constrained by the fact patterns of prior cases, and the determination that threats to a specific detainee by a specific source does not thereby equate with a requirement of such evidence in another case. *Sinn*, 911 F.3d at 421. In *Sinn*, we recognized that numerous cases had held that an inmate's articulation of a perceived threat was too vague or generalized to establish the defendant's subjective knowledge, but "our analysis in those cases about the specificity of the inmate's complaint was but one part of the greater analysis regarding the defendants' subjective knowledge." *Id.* We noted that "[t]he reason the specificity of an inmate's complaint matters is because that complaint is often the only information a prison official has of the treatment or conditions the inmate is experiencing. Failure-to-protect claims are predicated on a prison official's subjective knowledge, though, not just the ability of an inmate to write detailed complaints." *Sinn*, 911 F.3d at 422; *Horshaw v. Casper*, 910 F.3d 1027, 1028-29 (7th Cir. 2018) (noting that "prisoners do not threaten each other with the level of detail the judge demanded"). We must consider the context of the perceived threat as a whole, and whether the evidence, circumstantial, documentary or otherwise, was sufficient to indicate that the officials were aware of the substantial risk.

That can be shown in a variety of ways, including but not limited to an articulation of a specific threat, the obviousness of a risk, or the realities of prison gang conduct. See e.g. *Gevas*, 798 F.3d at 481 (defendants informed of a specific threat including the identity of the individual threatening him, the nature of the threat, and the context for it); *Sinn*, 911 F.3d at 422 (reasonable to infer that the defendant had subjective

knowledge of a threat even though the identity of the individual attacker could not be ascertained because the defendant was aware of the patterns of gang violence and the specific risk Sinn faced from the Vice Lords); *Horshaw*, 910 F.3d at 1029 ("[p]risoners do not need 'advance knowledge of every detail of a future assault' to show that they faced a serious risk;'" communication of an anonymous warning sufficient where gang context rendered it believable); *Farmer*, 511 U.S. at 842 (knowledge of a substantial risk is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence … and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious").

The common thread in all of our cases is that the circumstances as a whole must be considered. Therefore, the *Owens* court's conclusion that the single incident between the inmates was insufficient to apprise the guards of a substantial risk of harm does not indicate a single act of prior violence can never suffice. In *Owens*, the incidents between Owens and his cellmates, first Gordon and then Autin, both occurred only after a month of the two sharing a cell without any incident, and involved relatively minor altercations—between Owens and Gordon involved a single punch and between Owens and Autin involved Autin swinging at Owens but not landing a punch. 635 F.3d at 953. One cannot conclude from *Owens* that a single violent incident does not indicate an inmate is violent; in each case, the entire context must be considered, including, for instance, as in *Owens*, the entire history of the cellmates, and the severity of the actions and likelihood of a future threat.

Here, the nature of the communications between LaBrec and the defendants is disputed, with LaBrec and the prison officials presenting starkly different stories. The defendants repeatedly base their arguments on their version of the facts, recognizing but not always crediting the plaintiff's version. But on summary judgment, we do not resolve such credibility differences. Because it is the defendants who seek summary judgment, we consider the evidence, including all reasonable inferences, in the light most favorable to LaBrec, and in that context the district court improperly granted judgment for the defendants.

First, LaBrec's alleged communications in this case do not present the type of vague, generalized expression of danger that has been deemed insufficient. LaBrec did not allege that he believed that he was in danger in his cellblock generally without any particular basis such as gang affiliation, nor did he state that he was fearful of living with any cellmate. He identified *this* particular cellmate as presenting an immediate danger to himself and identified the basis for that belief by explaining that it was based on McNeely's behavior in the cell. He explained that McNeely was unstable and was acting crazy. That is specific enough to at least raise the specter of a serious risk of harm. See *Young v. Selk*, 508 F.3d 868, 873-74 (8th Cir. 2007) (complaints to guard that cellmate who had just been assigned to him was deranged and threatened him and seeking an immediate, urgent reassignment was sufficient to survive summary judgment as to the guard's subjective knowledge of the risk); compare *Olson*, 750 F.3d at 713 (inmate's claim that his cellmate Russell was dangerous because Russell was not taking prescribed medications and was hearing voices was contradicted in that the guards reported that Russell was taking the medications and Russell had no

history of violence). In fact, Walker, the Unit Manager, acknowledged that such a communication would warrant action, stating that if LaBrec had informed her that he felt he was at risk of harm from his cellmate she would not have returned him to his cell but would have moved him to another cell and worked with unit security staff to investigate. Walker did not recall LaBrec raising any such safety concerns, but that would be a factual dispute not resolvable on summary judgment. Finally, LaBrec provided even more detail in his sworn declaration filed with the court, stating that he communicated that McNeely was "acting very unstable, he would get all worked up, talking really fast, shaking his head back and forth, raising his voice and cursing," and "displaying very erratic behavior."[1] That specific description of the abnormal behavior added credence to his claim that he faced a safety risk.

The district court was dismissive of that characterization of McNeely's behavior, stating that LaBrec did not provide specifics of what McNeely was doing, and that "[w]ithout more context, a statement that the cellmate was 'acting crazy' could mean nothing more than that the cellmate was engaging in irritating but harmless behavior." Dist. Ct. Op. at 9. In the context here, it is questionable whether it would even be a reasonable inference that LaBrec's complaint of crazy, erratic and unstable behavior referenced only irritating but harmless behavior, given that LaBrec simultaneously stated

---

[1] The district court noted that LaBrec failed to include in his brief or his proposed findings of fact the allegations as to McNeely's behavior, but held that the allegations would be insufficient even if the court overlooked the failure to follow the court procedure. Given that LaBrec was proceeding pro se and that his request for counsel was denied, we agree that the better approach is to consider the facts attested to in his Declaration.

that he felt unsafe and needed to be moved from the cell. But we need not go that far.  The relevant question is whether a reasonable jury could infer that LaBrec's statement that McNeely was acting crazy and erratic and that he felt unsafe communicated that McNeely presented a threat to his safety and apprised the defendants that McNeely presented a risk of serious harm. LaBrec does not need to demonstrate that the jury would be compelled to draw that conclusion, only that it could.  *Gevas*, 798 F.3d at 482.  A reasonable jury certainly could interpret LaBrec's statement as to McNeely's behavior as communicating that McNeely presented a danger to LaBrec.

But we need not consider whether LaBrec's communication of McNeely's behavior alone is sufficient to demonstrate that McNeely presented a danger to LaBrec – and to apprise the defendants of that danger -- because the other surrounding circumstances lend further credence to his claim that he was in danger. Taken together, the evidence establishes that LaBrec communicated the threat to his safety -- identifying the behavior that led him to believe he was in danger -- and the surrounding circumstances supplied a context that rendered the threats plausible.  See *Gevas*, 798 F.3d at 481 (holding that a jury could infer that defendants were subjectively aware of the danger when Gevas identified the individual threatening him, the nature of the threat and supplied context that rendered the threat plausible). First, LaBrec's cellmate, McNeely, was in that restrictive housing unit following an incident in which McNeely assaulted his prior cellmate. See *Riccardo v. Rausch*, 375 F.3d 521, 527 (7th Cir. 2004) and *Olson*, 750 F.3d at 713 (both noting that one factor for a guard in determining whether a threat is credible is whether the person alleged to present the threat had a prior history of violence or

conflicts with other inmates). Second, LaBrec's claim that he was in danger was not a passing reference, but a repeated and insistent plea. He went to Psychological Services—the unit tasked with handling cell assignments—three times in a three-day period to express his fears for his safety and his need to transfer. When his request for a transfer was not granted and he realized he was not going to be transferred out of the cell with McNeely that night, LaBrec had an anxiety attack causing Dr. Schwenn from Psychological Services to come to LaBrec's cell and attend to him. Those repeated, insistent pleas for a transfer and the physical manifestation of his anxiety lend credibility to his claim that he believed McNeely presented a threat, and no countervailing factors negated that scenario. And finally, LaBrec was under a "pair with care" designation that recognized the potential for a problem with cellmate pairings, and the required psychological consultation prior to assigning an inmate had never occurred, thus circumventing the process that would have helped ensure that the cellmate placement did not present a danger. See *Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005) ("deliberate indifference can be predicated upon knowledge of a victim's particular vulnerability … or, in the alternative, an assailant's predatory nature ….").

All of those factors considered above are the types of considerations that this court has deemed relevant in assessing failure to protect claims by prisoners under the Eighth Amendment. The defendants argue that LaBrec failed to present evidence that such contacts with Psychological Services were unusual or that LaBrec had anxiety attacks rarely. Further, the defendants claim that there is no evidence in the record as to whether the "pair with care" designation was provided because LaBrec was particularly vulnerable as opposed

to particularly dangerous. But the defendants point to no evidence in the record, let alone undisputed evidence, that such use of Psychological Services was routine or that the "pair with care" designation is issued to inmates who present a particular danger. In fact, the only evidence in the record as to the meaning of the "pair with care" designation is that it requires a psychological consultation prior to assigning a cellmate, and that no such consultation occurred here. The arguments posed by the defendants as to the inferences that should be drawn from the evidence belong at the trial phase, not on summary judgment where all inferences must be taken in favor of the non-moving party. LaBrec does not need to negate all contrary interpretations of the evidence. Defendants are free to argue that placed in a different context, those visits were not unusual enough to apprise the defendants that he was in real fear of McNeely. On the record before us now, however, the evidence set forth by LaBrec would be sufficient to allow a jury to infer that those circumstances evidence a real threat of harm, and that the defendants witnessing LaBrec's complaints and the surrounding circumstances would be aware of that risk of harm. The factual inferences must be considered in combination, not in isolation from each other. Our cases are clear that the focus is on the circumstances as a whole in determining whether there is a factual dispute as to subjective knowledge.

But that does not end our inquiry, because we must consider each defendant individually and determine whether the facts allegedly known to that defendant are sufficient. There is evidence in the record that all defendants were aware of the pair with care designation which was not followed, LaBrec's complaints that he was not safe in his cell with McNeely, and his resort to Psychological Services. At least three defendants,

Walker, Craft, and Wilson, were aware of McNeely's assault on his prior cellmate, and Craft and Wilson were informed that LaBrec described McNeely as acting crazy and exhibiting erratic behavior. At least two defendants, Chatman and Meeker, were aware of LaBrec's anxiety attack when not transferred. Finally, LaBrec attested that at least two defendants, Craft and Wilson, determined that he should be transferred, but then failed to complete that transfer, and Walker also stated that if LaBrec had complained that he felt unsafe as he asserts in this case, Walker would have moved him to another cell while the claim was investigated.

As to two defendants, Chatman and Meeker, the court properly granted summary judgment. The evidence taken in the light most favorable to LaBrec shows only that Chatman and Meeker were aware that LaBrec claimed he did not feel safe with McNeely, that he was designated a pair-with-care, that he visited with Psychological Services and that he had an anxiety attack. Those defendants therefore were unaware of some of the other surrounding circumstances that could render plausible LaBrec's claim of a threat to his safety, such as the description of McNeely's behavior or the fact that he was moved to restrictive housing after an assault involving his prior cellmate. That is insufficient to allow an inference that a substantial risk of serious harm existed and that they in fact recognized that risk.

As to the remaining three defendants, that context that would render the claim of a risk of harm more plausible is present. The case as to Walker is close, but sufficient to survive summary judgment. The record demonstrates that Walker was aware that LaBrec claimed he did not feel safe with McNeely, that he was designated a pair-with-care, and that he

visited with Psychological Services seeking a transfer. In contrast to Chatman and Meeker, Walker also was aware that McNeely was transferred to restrictive housing following an assault involving his prior cellmate. Therefore, LaBrec's claim of feeling unsafe was rendered plausible not only by the consistency and intensity of his requests to Psychological Services, but also by the awareness that McNeely had recently been involved in an assault incident with his prior cellmate. In fact, Walker does not argue that he did not find the complaint of a risk of harm plausible. To the contrary, he argues that if LaBrec had indeed communicated that complaint to him, he would have removed LaBrec from that cell and investigated the matter. In light of the pair with care designation that already should have alerted the defendants to the need for scrutiny of potential cellmates prior to assignment, those facts are sufficient to meet the standard.

That is true as well for the final defendants, Craft and Wilson. The evidence in the record, if believed, could demonstrate that they were aware that LaBrec complained that he was not safe in a cell with McNeely, that he engaged with Psychological Services to address that problem and seek a transfer, that he was designated a pair-with-care, and that McNeely was in restrictive housing following an assault involving McNeely's prior cellmate; evidence in the record also indicates that they were informed of the substance of LaBrec's conversation with Dr. Persike which included LaBrec's claim that McNeely was acting crazy and displaying very erratic behavior. As previously discussed, in light of all of that evidence, a jury could reasonably infer that the defendants possessed a subjective awareness of a serious risk to LaBrec, and failed to take the minimal, reasonable action of inquiring further and investigating the situation. See *Sinn*, 911 F.3d at 422

(such subjective knowledge necessitates that the prison official take reasonable responsive actions); *Farmer*, 511 U.S. at 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they reasonably responded to the risk, even if the harm ultimately was not averted"). Had they investigated LaBrec's claim that McNeely posed the threat, they might have observed the troubling behavior of which LaBrec complained, or have found the Interview Request form in the cell, filled out by McNeely, in which McNeely stated that he planned on stabbing LaBrec. Based on the facts and circumstances taken in the light most favorable to LaBrec, summary judgment is not appropriate.

The remaining issue raised by LaBrec on appeal concerns the district court's denial of his request for counsel. We review a district court's determination whether to grant or deny counsel only for abuse of discretion. *Olson*, 750 F.3d at 711. In *Olson*, we noted that two questions are relevant to such a request for counsel: whether the plaintiff made a reasonable attempt to obtain counsel or was effectively precluded from doing so, and whether the plaintiff is competent to litigate the case himself, considering the complexity of the case and the plaintiff's capabilities. *Id*.

LaBrec argued that he was not capable of handling the case himself because he has mental health issues, he has limited access to the library because he is housed in disciplinary separation status, and he has been unable to take depositions. As to his mental health issues, he stated in the motion for appointment of counsel that he suffered from a number of mental illnesses but that the one that is most detrimental to his

ability to pursue his case is Attention Deficit Disorder. He further argued to the district court that a lawyer would be helpful for settlement discussions and at trial.

The district court considered those arguments and engaged in the proper analysis in denying counsel. First, the court held that LaBrec had shown that multiple lawyers declined to represent him. As to the second part of the analysis, the court held that plaintiff was capable of effectively representing himself. As an initial matter, the court noted that LaBrec had cited no evidence as to any mental health impairment, but assumed for the purpose of its decision that such impairments exist. The court held, however, that LaBrec's summary judgment motion showed no signs of any impairment. The court noted that "LaBrec's summary judgment submissions show that he is intelligent, understands law and procedure, and is capable of conducting discovery, explaining his version of events in a declaration, and making legal arguments in a brief." Dist. Ct. Op. at 12. In fact, the court concluded that LaBrec's summary judgment filings "were clear and thorough, showing skill and knowledge well above that of the average pro se litigant." *Id*. The court further held that LaBrec's housing status did not adversely impact him because additional legal research would not have aided him. Finally, the court held that LaBrec failed to identify why depositions would be necessary given his personal knowledge of most of the relevant facts and in light of his use of written discovery and his failure to identify any questions he was unable to ask in that discovery.

The court therefore properly considered LaBrec's request, but determined that he was capable of handling the case himself in light of his abilities and the complexity of the case. We

noted in *Olson*, 750 F.3d at 711, that "[d]istrict courts are … placed in the unenviable position of identifying, among a sea of people lacking counsel, those who need counsel the most," and that determination rests in the district court's discretion. "[O]ur job is to ensure that the district court applied the proper legal standards without abusing that discretion." *Id*. That standard is met here. The district court recognized the appropriate legal standards and applied them to LaBrec's request. There is no basis to conclude that the court abused its discretion in that determination.

Accordingly, the decision of the district court denying the request for counsel is AFFIRMED. The decision granting summary judgment is AFFIRMED as to Defendants-Appellees Jason Chatman and Dustin Meeker and is REVERSED as to the remaining Defendants-Appellees, Joshua Craft, Debra Wilson, and Lindsay Walker, and the case is REMANDED for further proceedings.